Filed 3/22/21  P. v. Hasan CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B302681 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA466399) |
| v. | |
| JIBRAIL ABDULRAHM HASAN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, David V. Herriford, Judge.  Remanded in part and affirmed in part.

Nilou Panahpour, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Paul M. Roadarmel, Jr. and Michael Katz, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Jibrail Abdulrahm Hasan appeals from his conviction for assault with a deadly weapon and assault by force likely to produce great bodily injury, both stemming from an incident with his former girlfriend. He contends the court erred by failing to give requested jury instructions regarding self-defense. He also argues that the jury was improperly instructed that it could find appellant guilty of using a deadly weapon under the theory that a knife is inherently deadly. Finally, he notes that the trial court failed to make an oral pronouncement of the sentence on count two, an error that respondent Attorney General concedes requires remand. We conclude that appellant has not established any prejudicial error with respect to the jury instructions. We therefore affirm the convictions and remand for resentencing on count two.

## PROCEDURAL HISTORY

On May 2, 2018, appellant was charged by information with one felony count of assault with a deadly weapon against his ex-girlfriend, Makaila (Pen. Code, § 245, subd. (a)(1)).[1] The information further alleged defendant suffered two prior strike convictions (§§ 667, subds. (b)-(j), 1170.12, subds. (a)-(d)) and one prior serious felony conviction (§ 667, subd. (a)(1)). An amended information filed on December 20, 2018 added a second count of assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4)), based on the same incident with Makaila.

Jury trial began on December 20, 2018. On January 14, 2019, the jury found appellant guilty on both counts. The court held a bifurcated bench trial on the prior conviction allegations

---

[1]All further statutory references are to the Penal Code unless otherwise indicated.

and found those allegations to be true.

The court denied appellant's motion for a new trial. The court granted appellant's *Romero* motion in part, striking one of the prior strike convictions. The court sentenced defendant to a total of 13 years in state prison, consisting of the upper term of four years on count one, doubled based on the prior strike (§§ 1170.12, subds. (a)-(d), 667, subds. (b)-(j)), plus five years for the prior felony conviction (§ 667, subd. (a)(1)). The court imposed and stayed the sentence on count two pursuant to section 654.[2] Appellant timely appealed.

## FACTUAL BACKGROUND

### I. Prosecution Evidence

#### A. *Makaila's testimony*

Makaila testified under subpoena. She dated appellant for about three years and gave birth to their son on March 2, 2018, when she was 20 years old. Makaila testified that she and appellant broke up shortly before their son was born. At the time of the incident on March 6, 2018, the baby was still in the neonatal intensive care unit and Makaila had been released from the hospital two days earlier. Makaila lived with appellant on and off in his residence, located in the back of his tattoo shop. The front of the building contained appellant's tattoo business, and the space behind that held appellant's office and a living area, which included a kitchen, living room, and bedrooms.

On March 6, 2018, around 7:30 p.m., Makaila went to

---

[2]As we detail further in Discussion Section III, the court did not announce a sentence for count two on the record. However, the minute order reflects that the court sentenced appellant on count two, and stayed the sentence.

3

appellant's tattoo shop to ask him for money to buy things for the baby.  Her mother, Lisa, drove her there; they were planning to go to the hospital afterward to visit the baby.  Makaila went into the business and her mother waited outside in the car.  Makaila testified that appellant's father, sister, and some employees were in the tattoo shop.  She found appellant toward the back of the residence in the living room area.  When she asked him for money, he said he "didn't have it anymore."  They started arguing and Makaila testified that she yelled at him "what happened to the money?"  She started crying and told appellant if he was not going to help, then she would take the baby's things and leave.

According to Makaila, she then moved to the bedroom to pack up some items.  Appellant yelled at her that she was not taking the baby's things and started grabbing things out of her hands.  He continued to grab things from her as she tried to leave the room.  She testified that "the argument started to get more serious when I made a comment and said that if he kept acting like this then he wasn't going to see" his son.  Makaila stated that appellant got angrier and was "in my face yelling, like, telling me that I wasn't going to take him anywhere."

When Makaila tried to leave, appellant pushed her and she pushed him back.  She testified that appellant was "pushing me and I was socking him," hitting him on his chest.  She started to get scared because she could see he was getting angrier after she told him he could not see the baby.  After she hit him twice, appellant pushed her backward onto the bed.  He got on top of her on the bed with his knee on her stomach.  It "hurt a lot" because she had just had the baby a few days before.  She continued to hit him as he pinned her down.  Finally Amber, the mother of another of appellant's children, pulled appellant off

4

Makaila and told them both to stop.  Makaila got up and she and appellant continued to argue, with Amber between them.

Makaila testified that after they got off the bed, appellant left the room and Amber told her to leave, so Makaila started to walk back toward the front entrance.  As she was leaving, appellant began to follow her.  She heard the door open, turned, and saw him coming up behind her, holding a knife.  Then appellant pinned her against a wall with his left hand on her neck, squeezing and choking her.  Makaila testified that appellant was holding a large kitchen knife in his right hand.  She stated that appellant was holding the blade of the knife to her neck.  She was not sure exactly how close the knife was to her neck, just that "he had it up to my neck" but she couldn't feel it touching her.  He was repeating that she was not going to "take his child away from him."  Appellant also said "watch what's going to happen if you take the baby from me."

After that, Makaila saw Lisa come to the gated entrance of the shop.  Lisa kicked the door and yelled for appellant to "get off of her."  Appellant looked at Lisa, immediately put the knife down to his side, and let Makaila go.[3]  Makaila then left the shop. Lisa asked Makaila if she was ok, then called the police.  Makaila did not suffer any injuries, but her stomach hurt until the next morning.

Officers from the Los Angeles Police Department (LAPD) arrived about five minutes later.  Makaila testified that she spoke to police officers several times that night.  She initially

---

[3]The parties stipulated that Makaila stated for the first time at trial that when Lisa kicked the gate, appellant had a surprised look and lowered the knife.

spoke with responding LAPD officer Julio Aguilar and his partner, as well as two emergency medical technicians (EMTs), who examined her for injuries. Makaila spoke again with the police officers when they escorted her into the tattoo shop to gather her things. After leaving the scene to visit the baby at the hospital, Makaila recalled speaking with someone who called her mother's phone, but she was not sure to whom she spoke.

Makaila also spoke to LAPD detective Robert Smey about a week after the incident. She said she did not know if she should tell the detective what happened because she was concerned about getting appellant in trouble.

Makaila testified that appellant called her to apologize the day after the incident. He said that he felt badly and "it wouldn't happen again." After his arrest the following week, appellant called her from jail up to 40 times and they also wrote letters to each other. The calls made by appellant from jail were recorded, and the prosecution played clips from some of the calls for the jury. [4] During these calls, appellant told Makaila several times that the only way to beat his case was if no one showed up to court. He made it clear to Makaila that he did not want her to testify against him and suggested ways to avoid getting served with a subpoena. Appellant also told her that if she did testify, she should not say anything or should claim she did not remember.

### B. *Lisa's testimony*

Lisa testified that she drove Makaila to appellant's tattoo shop on March 6, on their way to the hospital. Lisa waited in the

---

[4]At least some of these calls violated a protective order issued on March 19, 2018.

6

car, but grew concerned after Makaila was inside the shop for about fifteen minutes, so she walked to the front of the shop to see what was going on. Lisa testified that she could not get inside because the gate at the front of the shop was locked.

As she looked in the front window, Lisa saw appellant standing close to Makaila against a wall inside the shop. Later in her testimony, she stated that she first saw appellant dragging Makaila from the back room and "[t]hey were entwined." She stated that appellant was being "very aggressive" and had his left hand around her neck. Makaila was "pressed against" the wall. When asked if she saw what appellant was doing with his right hand, she said "It was on her. It was – whatever – . . . [¶] It wasn't in the air. It was a part of what was going on." Lisa testified, consistent with her prior statements, that she did not see appellant holding a weapon. She said she felt that appellant was hurting Makaila and so she "just started yelling" and kicking the gate. Once she did, appellant immediately turned to look at her and put his hands down. Makaila came out of the shop crying and looking upset.

The prosecution played Lisa's 911 call for the jury. In the call, Lisa told the operator that appellant "picked [Makaila] up by her neck" and started "choking her." When asked if she needed a paramedic, Lisa said "yes" because Makaila was "hurting, she's crying. He grabbed her by the neck." Lisa reported that she did not see any weapons, but that appellant was "choking [Makaila] and hitting her." After the operator directed Lisa to ask Makaila about weapons, Lisa responded that the assailant "had a knife." At trial, Lisa confirmed that this was the moment she learned from Makaila that there was a knife involved.

7

Lisa testified that before trial, people had been calling her attempting to dissuade her and Makaila from testifying against appellant. Appellant also called Lisa "a lot" from jail after his arrest.

During cross-examination, Lisa acknowledged that she had testified at the preliminary hearing that appellant did not hit or choke Makaila and it was "a big argument." She also testified at the preliminary hearing, contrary to her trial testimony, that she saw Makaila and appellant come out of the back room together, she did not see appellant come from behind or dragging Makaila, and that Makaila was "fighting back." Lisa also admitted that she, Makaila, and appellant were together at the hospital with the baby the next day.

### C. *Investigation*

Officer Aguilar testified that he responded to the incident with his partner around 7:45 p.m. on March 6, 2018. When they arrived, he spoke to Lisa, who seemed anxious and concerned about Makaila. They also saw appellant standing inside the door of the shop. Makaila was sitting down outside, crying, and seemed "fragile, nervous, agitated, and scared."

Officer Aguilar's interviews at the scene with Makaila and Lisa were captured on his body worn video camera. Both parties played excerpts of the video for the jury. The video showed Lisa telling officer Aguilar that she saw appellant hitting Makaila and choking her against a wall. Makaila told officer Aguilar that as she was leaving the shop, appellant "got a knife and he was just choking me against the wall." When asked for further details, she said that appellant had one hand holding a kitchen knife and "one hand on my throat." She said that appellant got the knife "while I was running out. He came and got me." Officer Aguilar

8

asked what appellant did with the knife while he was choking her and whether he put it on her neck. Makaila responded: "He put it against the wall by my face when he was holding me." When Makaila said appellant had a knife by her face by the wall, she demonstrated with her right hand by her face, above her head. Makaila also told police that her stomach hurt from earlier, when appellant had his knee on her stomach and was holding her down on the bed.

The video footage also showed a discussion between officer Aguilar and the EMT who had spoken with Makaila. The EMT reported that Makaila had no obvious bruising on her neck or bleeding and did not want to be transported to the hospital. The EMT also said that Makaila told him appellant punched her in the face, but she did not say anything about a knife. Officer Aguilar responded that he would speak with Makaila again. Officer Aguilar and the EMT then confirmed with Makaila that appellant choked her, and pulled out a knife, but did not stab her with it. At trial, Makaila testified several times that she told the officers that appellant "had me against the wall with the knife to my neck." However, she contended that the knife was not up by her face and she did not recall telling the officers that. She also confirmed that appellant punched her in the face.

In total, officer Aguilar testified that he spoke to Lisa and Makaila between three and four times at the scene, trying to "verify and confirm as much as I could of the events and exactly how they had happened." During one of the later interviews, Makaila again gestured to show him how appellant had the knife. She showed appellant's left hand on her throat and his right hand raised holding the knife.

Officer Aguilar also spoke to appellant, who was standing inside the locked front gate of his shop. Appellant refused the officer's request to unlock the door and to come outside. Appellant then disappeared into the back of the shop. Sometime later, the officers were able to get inside when someone else came out. The officers searched the business but did not find appellant. Officer Aguilar testified that he did not notice it at the time, but when he later reviewed his body worn camera footage, he saw a knife on the kitchen floor.

Officer Aguilar testified that he called Lisa and Makaila twice later that night after he returned to the station, to provide Makaila information about an emergency protective order (which she declined) and a victim advocate. He also had some follow-up questions about the incident and was trying to clarify what appellant was "actually doing with the knife and if [Makaila] remembers it." Officer Aguilar acknowledged that he did not document that he made these phone calls in his police report, but that his report was a summary of all of his interviews, including those at the scene and by phone.[5] He noted that his report erroneously stated that Lisa saw appellant with the knife in his hand, but testified that the prosecutor told him she was going to correct the error.

Detective Smey, the lead investigating officer on the case, also interviewed Lisa and Makaila. When he spoke with Lisa over the phone the day after the incident, she told him she saw appellant dragging Makaila forward toward the front of the store.

---

[5]The parties stipulated that Officer Aguilar told the prosecutor about the phone calls to Makaila and Lisa for the first time on January 3, 2019.

Appellant then pushed Makaila against the wall, and with one hand grabbed her by the neck and pinned her against the wall. She saw one of appellant's hands on Makaila's neck and the other hand was up by her face, but did not see a knife. Detective Smey spoke with Makaila in person on March 15, 2018. He testified that she seemed reluctant to speak to him. According to detective Smey, Makaila confirmed that appellant had pushed her, choked her, and held a knife to her face. She said appellant came up behind her as she was walking to the front, dragged her to the front room and then pushed her up against the wall. Detective Smey recounted that Makaila also said that appellant put a knee up against her stomach and grabbed her neck with one hand. Then she said that appellant pulled out a knife, brought the knife "up towards her over her head with the knife pointed down, and that he pulled it up and lowered it and held it in front of her face."

Makaila testified that she told the truth when she reported to detective Smey that appellant squeezed her throat until she felt pain and had difficulty breathing, although she had denied throat pain or difficulty breathing in her original statements at the scene. She also confirmed that she told detective Smey that appellant had the knife raised over her head with the blade pointing down at her. She claimed she did not remember if that statement was the truth, but that she "wouldn't make anything up." Similarly, she confirmed telling detective Smey that appellant suddenly brought the knife downward toward her face, and she did not remember if that was the truth, but "wouldn't lie." She also told detective Smey that appellant suspended the knife above her face in a threatening way. However, Makaila denied saying that appellant brought the knife up and down in a

11

slashing motion. She estimated that the knife was 11 inches long.

Appellant was arrested at his tattoo shop on March 15, 2018. When LAPD officers arrived, appellant was standing outside, but he ran inside and locked the door. When the officers entered pursuant to search and arrest warrants, they found appellant hiding in a bedroom covered with clothes and blankets.

## II. Defense Evidence

Appellant called two of his sisters as witnesses, both of whom were in the tattoo shop at the time of the incident. Maryam testified that she was watching TV in the front of the shop that evening when she heard Makaila yelling from one of the back rooms. The shop was open for business at the time and there were several other people in the shop. Maryam walked back and saw Makaila in a bedroom, yelling at appellant, who was in his office. Appellant asked Makaila to leave. Then, appellant walked away and Makaila followed him to the front of the building, still yelling and "cussing at him." After that, there "continued to be a lot of yelling," and employees and other people in the shop began asking Makaila to leave. Maryam testified that Makaila attempted to punch appellant, but he avoided it. She did not see Makaila make any physical contact with appellant. Makaila was "yelling about some clothes and saying some very negative things" to appellant, including, "I'm going to get somebody to F you up." Maryam stated that Makaila continued yelling for about five minutes, and then Makaila left the shop. According to Maryam, appellant never grabbed Makaila by the neck, was not holding a knife, and did not harm Makaila during the incident.

Jalilla, another of appellant's sisters, testified that she was in the shop at the time and noticed Makaila when Makaila started yelling about the baby's clothing. Jalilla stated that she saw Makaila and appellant in the doorway near the office. When Makaila started hitting appellant, he put his arms up defensively to block the blows. Appellant yelled at Makaila to stop and to leave. Finally, Jalilla testified that someone else walked up and told Makaila: "'You need to just leave. You guys are doing too much right now, there's customers in the shop.'" Then the other person "kind of like wrapped her arm around [Makaila] and walked her out the door." Jalilla did not see appellant put his hands on Makaila's neck and did not see him holding a knife.

Some of Jalilla's testimony at trial was impeached by the defense investigator, called by the prosecution in rebuttal. The investigator testified that he spoke with Jalilla a few months after the incident, and she told him that appellant guided Makaila out by "walking very close to her and directing her towards the door."

## DISCUSSION

### I. Self-Defense Instructions

Appellant contends the trial court erred in omitting the element regarding self-defense in the simple assault instruction (CALCRIM No. 915). He also argues that substantial evidence of self-defense required the court to give the general self-defense instruction, CALCRIM No. 3470, and the instruction regarding mutual combat, CALCRIM No. 3471.[6] We conclude that there

_____

[6]CALCRIM No. 3470 provides, in pertinent part, "The defendant is not guilty of [the charged crimes] if [he] used force against the other person in lawful [self-defense]. The defendant

13

was insufficient evidence to support a self-defense instruction and thus there was no error.

## A. *Background*

The trial court instructed the jury with CALCRIM No. 875 on the elements of assault with a deadly weapon (for count one) or by means of force likely to produce great bodily injury (for count two).[7] The court also instructed on the lesser included offense of simple assault (CALCRIM No. 915), but omitted the element to be given when instructing on self-defense, which required the prosecutor to prove that "[t]he defendant did not act (in self-defense)."

Defense counsel requested that the court include the self-

---

acted in lawful [self-defense] if: [¶] 1. The defendant reasonably believed that [he] was in imminent danger of suffering bodily injury (or was in imminent danger of being touched unlawfully); [¶] 2. The defendant reasonably believed that the immediate use of force was necessary to defend against that danger; [¶] AND [¶] 3. The defendant used no more force than was reasonably necessary to defend against that danger." CALCRIM No. 3471 states: "A person who (engages in mutual combat/ [or who] starts a fight) has a right to self-defense only if: [¶] 1. [He] actually and in good faith tried to stop fighting; [¶] [AND] [¶] 2. [He] indicated, by word or by conduct, to [his] opponent, in a way that a reasonable person would understand, that [he] wanted to stop fighting and that [he] had stopped fighting(;/.) [¶] [AND] [in cases of mutual combat] [¶] 3. [He] gave [his] opponent a chance to stop fighting.] [¶] If the defendant meets these requirements, [he] then had a right to self-defense if the opponent continued to fight."

[7]As the prosecutor explained during her closing argument, both counts were based on appellant's conduct when he grabbed her neck, pinned her to the wall, and held up the knife.

14

defense element of CALCRIM No. 915, arguing that a self-defense instruction was warranted given the testimony of the defense witnesses "regarding Makaila assaulting and/or attempting to assault Mr. Hasan at various times during the incident." The court denied the request, stating: "Basically both [defense] witnesses testified that your client didn't do anything. So if it's not a self-defense situation, it either happened or it didn't happen." Defense counsel renewed his request after the close of evidence, arguing that "Jalilla's testimony . . . included mention of the defendant defending himself." The court again denied the request.

### B. *Legal framework*

"It is well settled that a defendant has a right to have the trial court, on its own initiative, give a jury instruction on any affirmative defense for which the record contains substantial evidence [citation]—evidence sufficient for a reasonable jury to find in favor of the defendant [citation]—unless the defense is inconsistent with the defendant's theory of the case." (*People v. Salas* (2006) 37 Cal.4th 967, 982.) "'[A] trial judge must only give those instructions which are supported by substantial evidence,' and 'has the authority to refuse requested instructions on a defense theory for which there is no supporting evidence.'" (*People v. Larsen* (2012) 205 Cal.App.4th 810, 823; see also *People v. Nguyen* (2015) 61 Cal.4th 1015, 1048–1049 ["'[J]ust as with perfect self-defense or any defense, "[a] trial court need give a requested instruction concerning a defense only if there is substantial evidence to support the defense."'"].)

In this context, substantial evidence to support a defense instruction is "evidence sufficient to 'deserve consideration by the jury,' not 'whenever any evidence is presented, no matter how

15

weak.'" (*People v. Williams* (1992) 4 Cal.4th 354, 361, italics omitted; *People v. Lewis* (2001) 26 Cal.4th 334, 369.) "In determining whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence, but only whether 'there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt.'" (*People v. Salas, supra,* 37 Cal.4th at pp. 982-983.) "'"'"The fact that the evidence may not be of a character to inspire belief does not authorize the refusal of an instruction based thereon."'"' [Citation.] As an obvious corollary, if the evidence is minimal and insubstantial the court need not instruct on its effects.'" (*People v. Larsen, supra,* 205 Cal.App.4th at pp. 823–824.) The court is not obliged to instruct on theories that have no evidentiary support. (*Id.* at p. 824.)

On appeal, we review de novo whether the trial court had an obligation to give the requested instructions. (See *People v. Guiuan* (1998) 18 Cal.4th 558, 569; *People v. Sinclair* (1998) 64 Cal.App.4th 1012, 1017.)

**C.** *Analysis*

"'To justify an act of self-defense . . ., the defendant must have an honest and reasonable belief that bodily injury is about to be inflicted on him.' The threat of bodily injury must be imminent, and '... any right of self-defense is limited to the use of such force as is reasonable under the circumstances.'" (*People v. Minifie* (1996) 13 Cal.4th 1055, 1064–1065.) Appellant contends there was substantial evidence supporting the conclusion that he engaged in self-defense, citing evidence "from at least four witnesses to the incident," Makaila, Lisa, Maryam, and Jalilla, that Makaila and appellant "were engaged in a physical fight and that she 'socked'" appellant. We disagree. Appellant

16

inaccurately summarizes the evidence at trial and focuses largely on evidence of the first incident between the parties in the bedroom, which was not the basis of the charged offenses.

Rather, both charges were based on the second incident in the tattoo shop in which appellant pinned Makaila to the wall by her throat. We do not find substantial evidence that at the time of that incident, appellant reasonably believed he faced imminent bodily injury. Notably, both defense witnesses, Maryam and Jalilla, testified that appellant did not touch Makaila at all and never held her against the wall. Maryam stated that Makaila attempted to hit appellant, but he avoided her. Jalilla testified that Makaila managed to strike appellant, but that appellant responded only by holding up his arms in a defensive posture. If the jury believed this evidence, there would be no basis for a conviction regardless of a self-defense instruction.

On the other hand, while Makaila admitted getting into a physical altercation with appellant in the bedroom, once they were separated, she testified that she walked toward the front of the shop to leave. At that point, she stated that appellant came up behind her, grabbed her, and pinned her to the wall. She did not state that she hit or otherwise confronted appellant leading up to that conduct. Similarly, Lisa, the fourth witness to the incident whose testimony appellant largely ignores, did not provide evidence that Makaila hit appellant before he grabbed her. She testified that she saw appellant dragging Makaila into the front room and then pinning Makaila to the wall with his hand around her neck. As such, none of the evidence presented supported an instruction on self-defense related to the charged conduct.

Appellant's citation to *People v. Villanueva* (2008) 169 Cal.App.4th 41 (*Villanueva*) is unavailing. In *Villanueva*, the defendant and the victim got into a physical altercation in a parking lot. (*Id.* at p. 45.) Later that night, they encountered each other again in the same lot and the defendant told the victim to leave. (*Id.* at pp. 46-47.) The victim drove his car in reverse toward the defendant, then attempted to shift into gear to drive forward and leave, at which point the defendant shot him. (*Ibid.*) The defendant testified that he thought the victim was trying to hit him, but did not assert that he fired in self-defense. Instead, he claimed that he stepped back quickly and the gun accidentally discharged. (*Id.* at p. 47.) The trial court refused to give an instruction on self-defense, noting the absence of evidence that the defendant intentionally fired in self-defense. (*Id.* at p. 48.) The court of appeal reversed, citing evidence that the victim had threatened to kill the defendant and defendant thought the victim had armed himself upon returning to the parking lot. Thus, despite the defendant's assertion that the shooting was accidental, "[t]he jury could have concluded that defendant, fearing that he would be hit by [the victim's] van, intentionally shot [the victim] in self-defense. As there was sufficient evidence of self-defense, and defendant requested the instruction, the trial court was required to give the instruction." (*Id.* at p. 52.)

Appellant also cites similar cases in which the defendant's theory of accidental shooting was inconsistent with self-defense, but there was other substantial evidence from which the jury could have found the defendant acted intentionally and in self-defense. (See *People v. Barton* (1995) 12 Cal.4th 186, 202–203 [finding sufficient evidence of intentional shooting in imperfect self-defense despite the defendant's assertion that the shooting

18

was accidental]; *People v. Elize* (1999) 71 Cal.App.4th 605, 610 ["A jury ... could disbelieve defendant's testimony that the firing was accidental, and decide instead that he had fired intentionally."]; *People v. Mayweather* (1968) 259 Cal.App.2d 752, 756 [jury could have found shooting in self-defense despite defendant's assertion of accident].)

These cases are distinguishable. Each one involves circumstances in which there was substantial evidence from which the jury could find that the defendant acted in self-defense, despite his or her own testimony to the contrary. Here, as we have discussed, there was no such evidence.[8] Thus, the court did not err in refusing to instruct the jury on self-defense.

## II. Deadly Weapon

The jury found appellant guilty in count one of assault with a deadly weapon under section 245, subdivision (a)(1). The court instructed the jury that the weapon—the kitchen knife—could be either inherently deadly or deadly in the way appellant used it. Appellant contends this was error, as a knife is not inherently deadly. Respondent concedes the error, but argues that it was not prejudicial. We agree with respondent that under the circumstances, the error was harmless beyond a reasonable doubt.

### A.    *Erroneous instruction*

The jury was instructed using CALCRIM No. 875 for count

[8]Appellant's suggestion that the jury was left with an "all or nothing choice" between convicting him of the charged offenses or acquitting him of all charges lacks merit. The court instructed the jury on the lesser included offense of simple assault. Appellant's references to the requirements for instruction on lesser included offenses are therefore inapplicable.

one, assault with a deadly weapon as follows: "To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant did an act with a deadly weapon other than a firearm that by its nature would directly and probably result in the application of force to a person; [¶] 2. The defendant did that act willfully; [¶] 3. When the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone; [¶] AND [¶] 4. When the defendant acted, he had the present ability to apply force with a deadly weapon other than a firearm to a person." The instruction further stated that "[t]he People are not required to prove that the defendant actually touched someone," or that "the defendant actually intended to use force against someone when he acted."

The instruction defined "great bodily injury" as "significant or substantial physical injury. . . . It is an injury that is greater than minor or moderate harm." In the provision at issue here, the instruction defined "deadly weapon other than a firearm" as "any object, instrument, or weapon that is inherently deadly or one that is used in such a way that it is capable of causing and likely to cause death or great bodily injury."

In her closing argument, the prosecutor addressed this element as follows: "You have a weapon. There's no dispute. A knife. Of course it can be a deadly weapon. Something as sharp as this doesn't do well with skin. You can cut someone. You can injure them. You can maim them. You can kill them with one artery. So this of course is a deadly weapon. [¶] But, look, just having a knife is not a weapon, right - - it's not a crime, right? People have kitchen knives all the time. Nothing wrong with that, it's what you do with the kitchen knife. [¶] When you take a

20

knife and when you're holding somebody by the neck pinning them on a wall and if you hold the knife up to their head or their face or their neck and you're pushing against them and you're threatening them, in that moment, that can constitute an assault with a deadly weapon. . . . [¶] Why? Because you are seconds away from stabbing them in the face." The prosecutor also argued that the first element of assault meant: "[D]id the defendant do an act with the knife that would result in some type of a harmful or offensive touching? . . . When you hold a knife above someone, even if you just hold it inches within their face, right, of course that can result in harmful touching."

### B. *Legal standards*

"'As used in section 245, subdivision (a)(1), a "deadly weapon" is "any object, instrument, or weapon which is used in such a manner as to be capable of producing and likely to produce, death or great bodily injury." [Citation.] Some few objects, such as dirks and blackjacks, have been held to be deadly weapons as a matter of law; the ordinary use for which they are designed establishes their character as such. [Citation.] Other objects, while not deadly per se, may be used, under certain circumstances, in a manner likely to produce death or great bodily injury.'" (*People v. Aledamat* (2019) 8 Cal.5th 1, 6 (*Aledamat*).) "Because a knife can be, and usually is, used for innocent purposes, it is not among the few objects that are inherently deadly weapons. 'While a knife is not an inherently dangerous or deadly instrument as a matter of law, it may assume such characteristics, depending upon the manner in which it was used.'" (*Ibid.*, quoting *People v. McCoy* (1944) 25 Cal.2d 177, 188, [153 P.2d 315].) Thus, in *Aledamat*, our Supreme Court found that "the trial court erred in presenting the

jury with two theories by which it could find the box cutter [a kind of knife] a deadly weapon: (1) inherently or (2) as used. The first theory (inherently) is incorrect, but the second theory (as used) is correct." (*Aledamat, supra*, 8 Cal.5th at p. 7.)

The *Aledamat* court then examined the standard for determining prejudice where the trial court instructs on a legally inadequate theory. It explained that when the "theory is legally erroneous—i.e., of a kind the jury is *not* equipped to detect—a higher standard must be met for the error to be found harmless." (*Aledamat, supra*, 8 Cal.5th at p. 7.) This test "reflect[s] the view that jurors are 'well equipped' to sort factually valid from invalid theories, but ill equipped to sort legally valid from invalid theories." (*Ibid.*, quoting *People v. Guiton* (1993) 4 Cal.4th 1116, 1126.) The court concluded that, when a legally incorrect jury instruction on an alternative theory of guilt is at issue, "[t]he reviewing court must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, it determines the error was harmless beyond a reasonable doubt." (*Aledamat, supra*, 8 Cal.5th at p. 13, applying *Chapman v. California* (1967) 386 U.S. 18, 24.)

## C. *Analysis*

The parties agree that under *Aledamat*, CALCRIM No. 875 was erroneous to the extent it defined a deadly weapon, here the knife, as any object, instrument, or weapon that is inherently deadly. Appellant contends the error was prejudicial. We disagree.

Appellant argues that "the evidence about Mr. Hasan's use of a knife was anything [but] clear," citing the different testimony from Makaila, officer Aguilar, and detective Smey regarding what

22

exactly appellant did with the knife.  All of this evidence stemmed from statements made, through testimony or prior statements, by Makaila.  But under any version of the testimony, it is clear the error was harmless. Makaila testified at trial that appellant held the blade of the knife within inches of her neck as he threatened, "watch what's going to happen if you take the baby from me."  She also stated that she told police officers the same thing.  As reflected on the body worn camera footage, she told officer Aguilar at the scene that appellant had the knife by her face by the wall. In addition, she demonstrated what appellant did in the video by bringing her right hand by her face, above her head.  Lisa also stated that she saw appellant's hand by Makaila's face, although she did not see a knife.  Both officer Aguilar and detective Smey testified that Makaila told them appellant raised the knife over her head with the blade pointing toward her.  Even assuming the jury discounted the statements by officer Aguilar and detective Smey, as appellant argued they were exaggerated and falsified, Makaila's testimony that appellant held an 11-inch knife next to her neck or her face established defendant's use of the weapon in a manner likely to cause great bodily injury.  The jury necessarily rejected appellant's argument that he did not use the knife in a way that would probably result in the application of force when it found him guilty of assault.  (See *Aledamat, supra*, 8 Cal.5th at p. 14.)  Under those circumstances, we conclude the jury necessarily found that appellant used the knife in a deadly manner.

The closing arguments by the prosecutor do not compel a different result.  Although she stated that a knife "of course is a deadly weapon," she then immediately explained that "just having a knife is not a weapon, right - - it's not a crime, right?

People have kitchen knives all the time.  Nothing wrong with that, it's what you do with the kitchen knife."  She also repeatedly argued that it was appellant's conduct with the knife—holding it above Makaila's head and next to her face and neck—that met the elements of the assault charge. As such, appellant's contention that the prosecutor argued "that just holding a knife was enough to convict" is not supported by the record.

We also reject appellant's reliance on *People v. Stutelberg* (2018) 29 Cal.App.5th 314, in which the court found prejudicial error on one of the assault charges.  There, the victim was unharmed after the defendant "swung" at him but missed.  (*Id*. at p. 322.)  The court noted it was unclear whether the defendant was holding a box cutter in the same hand.  (*Ibid*.)  Further, although a witness testified that the defendant "jabbed a box cutter at both [the victim] and him in a manner likely to cause great bodily injury, the jury apparently disbelieved his testimony, acquitting [the defendant] of assault with a deadly weapon against [that witness]."  (*Ibid*.)  As such, the court found that "[t]he exact manner in which [the defendant] used the box cutter against [the victim] is thus unclear.  The jury could reasonably conclude that his 'flicking' motion was more of a threat, as opposed to an act likely to cause death or great bodily injury. Under these circumstances, we cannot say that the court's error in instructing the jury regarding an inherently dangerous weapon was harmless beyond a reasonable doubt."  (*Ibid*.)

Here, on the other hand, Makaila testified that appellant held the knife close to her neck and/or her face.  There was no evidence from which the jury could have found that appellant assaulted Makaila with the knife without also concluding that he

used the knife in a deadly manner.  As such, the inclusion of the erroneous instruction was harmless beyond a reasonable doubt.

## III.  Sentencing

Appellant contends the matter must be remanded for sentencing because the court failed to make an oral pronouncement of the sentence on count two on the record. Respondent agrees.

The minute order from the sentencing hearing states that the court imposed a four year term on count two, doubled for the prior strike conviction, stayed pursuant to section 654.  However, the transcript of the hearing does not reflect that the court orally pronounced a sentence on count two.  "The record of the oral pronouncement of the court controls over the clerk's minute order."  (*People v. Farell* (2002) 28 Cal.4th 381, 384, fn. 2; see also *People v. Zackery* (2007) 147 Cal.App.4th 380, 387–388 ["The clerk cannot supplement the judgment the court actually pronounced by adding a provision to the minute order and the abstract of judgment."].)

"The failure to pronounce sentence on a count is an unauthorized sentence and subject to correction on remand." (*People v. Price* (1986) 184 Cal.App.3d 1405, 1411, fn. 6.)  We therefore remand the matter for resentencing on count two.

**DISPOSITION**

The matter is remanded for resentencing on count two.
The judgment of the trial court is affirmed in all other respects.
**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.


We concur:


MANELLA, P. J.


CURREY, J.